ORIGINAL
FILED
2011 NOV 10 P 2: 39

(15)

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  ROBBINS GELLER RUDMAN
       & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
4  Telephone: 415/288-4545
   415/288-4534 (fax)
5  shawnw@rgrdlaw.com
        – and –
6  DARREN J. ROBBINS (168593)
   DAVID C. WALTON (167268)
7  655 West Broadway, Suite 1900
   San Diego, CA  92101-3301
8  Telephone: 619/231-1058
   619/231-7423 (fax)
9  darrenr@rgrdlaw.com
   davew@rgrdlaw.com
10

11 Attorneys for Plaintiff

12 [Additional counsel appear on signature page.]

E-filing

13                  UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

PJH

15  GARY SIMON, Individually and on Behalf of )  No.
    All Others Similarly Situated,                    )
16                                                     )      CV  11  5479
                                                       )
17                              Plaintiff              )   CLASS ACTION
                                                       )
18         vs.                                          )   COMPLAINT FOR VIOLATION OF THE
                                                       )   FEDERAL SECURITIES LAWS
19  DIAMOND FOODS, INC., MICHAEL J.                    )
    MENDES and STEVEN M. NEIL,                         )
20                                                     )
                              Defendants.              )   DEMAND FOR JURY TRIAL
21                                                     )

22

23

24

25

26

27

28

**SUMMARY OF ACTION**

1.      This is a securities class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all persons who purchased or otherwise acquired Diamond Foods, Inc. ("Diamond" or the "Company") publicly traded securities between December 9, 2010 and November 4, 2011, inclusive (the "Class Period").  The claims asserted herein are brought against Diamond and certain of its current officers and directors, including Michael J. Mendes, the Company's Chairman and Chief Executive Officer, and Steven M. Neil, the Company's Chief Financial Officer.

2.      During the Class Period, defendants engaged in a fraudulent scheme and multiple violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the Securities and Exchange Commission ("SEC"), by making false and misleading statements concerning the Company's current and future financial condition.

3.      During the Class Period, defendants misrepresented Diamond's current financial condition and prospective financial results, including but not limited to: (a) reported earnings and expenses incurred during the Company's fiscal year 2011; (b) fiscal 2011 projected revenue and earnings and the timing thereof; and (c) overall shareholder value related to a proposed acquisition of The Procter & Gamble Company's ("P&G") Pringles business, purportedly scheduled to close in December 2011.

4.      Defendants' misrepresentations during the Class Period caused the Company's stock to trade at artificially inflated prices, reaching a Class Period high of $92.47 on September 20, 2011.

5.      On November 1, 2011, Diamond issued a press release announcing that the Audit Committee of the Board of Directors was conducting an internal investigation into payments made to walnut growers in September 2011 and the accounting for such payments.  In addition, the Company stated that in light of the accounting investigation, the acquisition of P&G's Pringles business scheduled to close in December 2011 would be delayed to mid-2012.

6. On the November 1, 2011 disclosures, the Company's stock price plummeted 17% to close at $52.79 per share on November 2, 2011, down from a close of $64.12 per share on November 1, 2011, on massive trading volume.

7. Then on November 5, 2011, *Barron's Online* published an article entitled "Getting to the Nut of the Problem." The article discussed in detail the Company's September 2011 "momentum payment" to walnut growers and suggested that the Company may have overstated its fiscal 2011 financial results.

8. On November 7, 2011, following these disclosures, Diamond's stock price continued to decline on substantial trading volume, falling to a close of $39.09 per share, a 15% decline from its Friday, November 4, 2011 close of $46.40 per share.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5. Jurisdiction is conferred by §27 of the Exchange Act.

10. Venue is proper pursuant to §27 of the Exchange Act. Diamond's headquarters are located in San Francisco, California, and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

11. Plaintiff Gary Simon purchased or otherwise acquired Diamond publicly traded securities during the Class Period, as detailed in the attached certification, and was damaged by the conduct alleged herein.

12. Defendant Diamond sells snack products to global, national, regional and independent grocery, drug and convenience store chains, as well as to mass merchandisers and club stores. Defendant Diamond maintains its corporate headquarters in San Francisco, California.

13. Defendant Michael J. Mendes ("Mendes") was, at all relevant times during the Class Period, Chairman of the Board of Directors and Chief Executive Officer of the Company, and signed the Company's September 15, 2011 Form 10-K filed with the SEC.

14.     Defendant Steven M. Neil ("Neil") was, at all relevant times during the Class Period, Chief Financial Officer and a director of the Company, and signed the Company's September 15, 2011 Form 10-K filed with the SEC.

15.     The defendants named in ¶¶13-14 are referred to herein as the "Individual Defendants."

## CONTROL PERSONS

16.     As officers and controlling persons of a publicly held company whose common stock was and is traded on the NASDAQ and who is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Diamond, each of the Individual Defendants had access to the adverse undisclosed information about Diamond's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Diamond and its business or adopted by the Company materially false and misleading.

18.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be

1  misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent
2  their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is
3  responsible for the accuracy of the public reports and releases detailed herein and is therefore
4  primarily liable for the representations contained therein.

5      19.    The Company and the Individual Defendants are liable as participants in a fraudulent
6  scheme and course of business that operated as a fraud or deceit on purchasers of Diamond
7  securities by disseminating materially false and misleading statements and/or concealing material
8  adverse facts.  The scheme: (i) deceived the investing public regarding Diamond's business,
9  operations, management and the intrinsic value of Diamond securities; and (ii) caused plaintiff and
10  other members of the Class to purchase Diamond securities at artificially inflated prices.

11                                  **BACKGROUND**

12      20.    Diamond was incorporated in Delaware in 2005 as the successor to Diamond Walnut
13  Growers, Inc., a member-owned California agricultural cooperative association.  In July 2005,
14  Diamond Walnut Growers, Inc. merged with and into Diamond Foods, Inc., converted from a
15  cooperative association to a Delaware corporation, and completed an initial public offering of
16  Diamond common stock. The Company specializes in processing, marketing and distributing snack
17  products and culinary, in-shell and ingredient nuts.  The Company sells its products through the
18  following product categories:

19      (a)    Snack.  The Company sells snack products under the Emerald®, Pop Secret®
20  and Kettle Brand® brands. Emerald products include roasted, glazed and flavored nuts, trail mixes,
21  seeds, dried fruit and similar offerings packaged in resealable containers.  Pop Secret microwave
22  popcorn from General Mills is offered in a variety of traditional flavors, as well as a "better-for-you"
23  product offering featuring 100-calorie packs.  Kettle Brand is a leading premium potato and tortilla
24  chip company.

25      (b)    Culinary and Retail In-shell.  The Company sells culinary nuts under the
26  Diamond of California® brand in grocery store baking aisles and produce aisles and through mass
27  merchandisers and club stores.  Culinary nuts are marketed to individuals who prepare meals or

28

1   baked goods at home and who value fresh, high-quality products.  Diamond also sells in-shell nuts

2   under the Diamond of California® brand, primarily during the winter holiday season.

3        (c)    <u>Non-Retail</u>.  The Company markets ingredient nuts internationally under the

4   Diamond of California® brand to food processors, restaurants, bakeries and food service companies

5   and their suppliers.

6   <center>**SUBSTANTIVE ALLEGATIONS**</center>

7       21.    On December 8, 2010, the Company issued a press release announcing its first quarter

8   fiscal 2011 financial results reporting a 40% increase in sales and increasing its revenue and earnings

9   guidance for fiscal 2011. The press release stated as follows:

**Diamond Reports a 40% Increase in Sales and Raises Guidance**

- Retail net sales grew 58%, led by a 130% increase in snack sales;

- Raising full-year sales guidance to $920 million to $945 million;

- Raising full-year EPS guidance to $2.43 to $2.49.

. . . Diamond Foods, Inc. today reported strong financial performance for its first quarter of fiscal 2011 and increased guidance for the full-year.

For the three months ended October 31, 2010, net sales grew 40 percent, with retail sales growing 58 percent to $227.8 million and snack sales increasing 130 percent to $137.6 million. Non-retail sales declined 32 percent to $24.8 million due primarily to the later tree nut harvest. Operating income increased 7 percent to $27.5 million, which includes a 98 percent increase in advertising for the quarter compared to the prior year. Fully diluted earnings per share (EPS) was $0.64, and excluding integration costs related to the acquisition of Kettle Foods, non-GAAP EPS was $0.65.

"We are pleased with the organic growth in our base retail business, which has been augmented by the addition of Kettle," said Michael J. Mendes, Chairman, President and CEO. "Our strong performance gives us the confidence to further invest in our brands while increasing our sales and earnings guidance."

<center>*    *    *</center>

<center>**Financial Highlights**</center>

For the quarter, gross profit as a percentage of net sales was 25.2 percent.

Selling, general and administrative expense (SG&A) was $23.1 million during the quarter, or 9.1 percent of net sales compared to 7.5 percent of net sales during the prior year's period.

<center>*    *    *</center>

**Financial Outlook**

For the second quarter of fiscal 2011, we expect sales of between $255 million and $265 million and non-GAAP EPS of between $0.85 and $0.91, reflecting an increase in first half of fiscal year guidance from $1.45 to $1.55 per share to $1.50 to $1.56 per share compared to $1.35 per share last year.

For the full year of fiscal 2011, we now expect sales of between $920 million and $945 million compared to $910 million and $940 million previously, which implies growth of 35 percent to 39 percent above fiscal 2010. We expect non-GAAP EPS to range from $2.43 to $2.49 compared to $2.38 to $2.48 previously. This implies net income growth of between 48 percent and 51 percent over fiscal 2010 non-GAAP results.

22.     On December 8, 2010, the Company filed its quarterly report on Form 10-Q with the SEC. The Form 10-Q was signed by defendant Neil and repeated and expanded upon the financial results in the December 8, 2010 press release. The Form 10-Q also discussed the manner in which the Company received and paid for walnuts used in its consumer snack products, including but not limited to stating that the purchase price to be paid to walnut growers would be determined by Diamond in good faith.

23.     After the December 8, 2010 earnings release and Form 10-Q were issued, the Company's stock price increased from a close of $45.82 per share on December 8, 2010 to a close of $50.59 per share on December 9, 2010.

24.     On March 8, 2011, the Company issued a press release announcing its financial results for its second quarter of fiscal 2011, reporting record results and again increasing the Company's financial guidance for fiscal year 2011:

**Diamond Reports Record Sales and Earnings and Increases Guidance**

- Retail net sales grew 63 percent, fueled by the addition of Kettle and double-digit organic snack sales growth;

- Earnings more than doubled leading to non-GAAP EPS growth of 90%;

- Raising full-year non-GAAP EPS guidance to $2.45 to $2.51.

. . . Diamond Foods, Inc today reported record sales growth and a more than doubling of earnings in its second quarter of fiscal 2011. The company is increasing full-year non-GAAP earnings per share (EPS) guidance by $0.02 to a range of $2.45 to $2.51 . . . .

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                      - 6 -

For the three months ended January 31, 2011, diluted EPS grew 67 percent to $0.87 compared to $0.52 for the prior year's comparable period. Excluding $0.9 million in integration costs related to the Kettle acquisition last March, non-GAAP EPS was up 90 percent to $0.91 compared to $0.48 for the prior year's quarter.

\*     \*     \*

**Financial Highlights**

Net sales during the quarter were $257.6 million, 40 percent above the prior year, and retail sales were $215.6 million, up 63 percent, driven by significant snack revenue growth due to the addition of Kettle and strong organic snack sales. In-shell retail sales were up 15 percent driven by strong sell through during the holiday season.

\*     \*     \*

Selling, general and administrative expense (SG&A) was $24.0 million during the quarter, or 9.3 percent of net sales. Advertising expense was on plan at $10.0 million for the quarter. A greater portion of consumer support will be spent in the second half of the fiscal year.

The effective tax rate was 34.2 percent for the quarter.

EBITDA grew 81 percent to $83.4 million year to date.

As of January 31, 2011, net debt outstanding was $525.4 million, a reduction of $21.6 million from the first fiscal quarter.

**Financial Outlook**

For the third quarter of fiscal 2011, we expect non-GAAP EPS of between $0.45 and $0.50 and net sales of between $210 million to $220 million.

For the full year of fiscal 2011, we now expect net sales of between $925 million and $950 million compared to $920 million and $945 million previously, which implies growth of 36 percent to 40 percent above fiscal 2010. We are raising non-GAAP EPS guidance by $0.02 to a range of $2.45 to $2.51, which implies net income growth of between 53 percent and 57 percent over fiscal 2010 non-GAAP results.

25.     On March 8, 2011, the Company filed its quarterly report on Form 10-Q with the SEC. The Form 10-Q was signed by defendant Neil and repeated and expanded upon the financial results in the March 8, 2011 press release. The Form 10-Q also discussed the manner in which the Company received and paid for walnuts used in its consumer snack products, including but not limited to, stating that the purchase price to be paid to walnut growers would be determined by Diamond in good faith.

1       26.    On April 5, 2011, the Company announced that it had entered into a definitive

2  agreement with P&G to merge P&G's Pringles business into Diamond. The transaction was valued

3  at $2.35 billion in cash and stock and would be accomplished through a "Reverse Morris Trust"

4  transaction. The press release discussed the Company's projected fiscal 2011 financial results had

5  Pringles been owned by the Company for the entire fiscal year and estimated fiscal 2012 results for

6  the combined Company.

**Diamond Foods to Merge P&G's Pringles Business into the Company**

*Accretive combination makes Diamond the number two global player in savory snack category*

> . . . Diamond Foods, Inc. and The Procter & Gamble Company today announced the signing of a definitive agreement to merge the Pringles business ("Pringles") into Diamond Foods in a transaction valued at $2.35 billion.

> "Pringles is an iconic, billion dollar snack brand with significant global manufacturing and supply chain infrastructure," said Michael J. Mendes, Chairman, President and CEO of Diamond Foods. "Our plan is to build upon the brand equity Pringles has established in over 140 countries. This strategic combination will create an independent, global leader in the snack industry with a focus on quality and innovative products. Not only is this combination immediately accretive, it also creates a platform that we believe will allow us to build shareholder value for years to come."

> \*    \*    \*

> The combination will more than triple the size of Diamond's snack business and:

> - Increase scale in U.S. grocery, mass merchandise, drug and convenience channels to gain greater merchandising and distribution influence;

> - Leverage Diamond's sales and distribution infrastructure through a more than doubling of snack sales in the U.S. and U.K., which are Pringles' two largest markets;

> - Gain a broader global manufacturing and supply chain platform, with access into key growth markets around the world, including Asia, Latin America and Central Europe;

> - Increase Diamond's geographic diversity, with international sales accounting for approximately 49 percent of total revenues on a pro forma basis.

> Diamond Foods has a history of building, acquiring and energizing brands through product and package innovation, efficient distribution and brand investment. ***The Company's total revenues have doubled and earnings per share (EPS) have grown more than four-fold in the past five years.***

> \*    \*    \*

**Financial Benefit for Diamond Foods Shareholders**

Assuming Pringles had been owned for all of fiscal year 2011, the combined company would be expected to deliver the following estimated financial results on a pro forma basis for fiscal year 2011:

- Net sales of approximately $2.4 billion;

- Double-digit accretion to earnings per share (EPS), excluding merger and integration costs;

- Estimated earnings before interest, taxes, depreciation and amortization (EBITDA), including $25 million in synergies, of approximately $398 million to $410 million.

For fiscal year 2012, Diamond anticipates strong growth in its core business with EPS of $2.85 to $2.98 per share on a standalone basis, an increase of 15 percent to 20 percent from the midpoint of its fiscal 2011 guidance range, which represents a 30 percent increase over 2010 EPS.

Combined results for Diamond plus the Pringles business for fiscal year 2012 will depend on the actual closing date of the transaction. Assuming the transaction closes by the end of calendar 2011, seven months of Pringles performance would be included in the following expected results:

- Fiscal 2012 total net sales are estimated to be approximately $1.8 billion;

- Fiscal 2012 EPS, before costs associated with the transaction and integration, are estimated to range from $3.00 to $3.10 per share, which reflects EPS accretion of 12 to 15 cents per share

The transaction is expected to significantly increase cash flow and accelerate the de-levering of Diamond's balance sheet. Pro forma leverage at closing is projected to be below four times EBITDA, and projected to drop below three times at the end of fiscal 2013. Cash flow after brand investments and capital expenditures is expected to approach $200 million in the first full fiscal year after closing the merger.

\*      \*      \*

**Transaction Details**

P&G expects the separation to occur through a "split-off" transaction in which P&G shareholders can elect to participate in an exchange offer to exchange P&G shares for shares of Diamond. Under the terms of a split-merge agreement, P&G will establish a separate entity to hold the Pringles business, which will be distributed to electing P&G shareholders in a tax-efficient transaction with a simultaneous merger with Diamond. This "Reverse Morris Trust" transaction has been approved by the boards of both companies. We expect to finalize the details of this transaction in the coming months.

The value of the transaction is $2.35 billion, comprising $1.5 billion in Diamond common stock, consisting of 29.1 million shares for approximately 57 percent of the outstanding shares of the combined company, and the assumption of

$850 million of Pringles debt. Diamond's existing shareholders would continue to own approximately 43 percent of the combined company.

The parties have also agreed to a collar mechanism that would adjust the amount of debt assumed by Diamond based upon Diamond's stock price during a trading period prior to the commencement of the Exchange Offer. The amount of debt to be assumed by Diamond could increase by up to $200 million or decrease by up to $150 million based on this adjustment mechanism.

Diamond expects to incur one-time costs of approximately $100 million related to the transaction over the next two years. P&G also will provide Diamond transition services for up to 12 months after closing.

**Leadership, Approvals and Timing**

The combined business will be managed by Diamond's executive team and board of directors, led by Michael J. Mendes, Chairman, President and CEO. The company's headquarters will remain in San Francisco, California.

The transaction is subject to approval by Diamond shareholders and the satisfaction of customary closing conditions and regulatory approvals. The transaction is expected to be completed by the end of calendar 2011.

(Footnotes omitted.)

27.     After the April 5, 2011 announcement of the Company's agreement with P&G to acquire the Pringles business, Diamond's stock price increased more than 8% from a close of $57.22 per share on April 4, 2011 to a close of $62.39 per share on April 6, 2011, on heavy trading volume.

28.     On June 2, 2011, Diamond reported its third quarter fiscal 2011 financial results. The Company reported that sales and earnings increased 61% and 91%, respectively, and raised its guidance for fiscal 2011 non-GAAP EPS to $2.48-$2.52 per share from $2.45-2.51 per share.

**Diamond Foods Raises Guidance After Strong Third Quarter**

• Net sales increased 61%, non-GAAP earnings grew 91%;

• Snack sales up 72%, reflecting double-digit organic snack sales growth and the addition of Kettle;

• ***Raising full-year fiscal 2011 non-GAAP EPS guidance.***

. . . Diamond Foods, Inc. today reported strong financial results for its third quarter of fiscal 2011 and raised guidance for fiscal year 2011.

For the three months ended April 30, 2011 non-GAAP diluted earnings per share (EPS) was $0.52 and non-GAAP net income was $11.8 million, 91 percent above the prior year's comparable net income. On a GAAP basis, EPS was $0.34 compared to $(0.22) for the prior year's comparable period. This year's GAAP EPS included costs associated with the announced merger with Pringles and integration

costs associated with the Kettle acquisition, while last year's GAAP EPS included costs associated with the Kettle acquisition.

"Our business performed well during the quarter, including double digit organic growth in our snack portfolio," said Michael J. Mendes, Chairman, President and CEO. "Based on our strong overall performance and effective integration of Kettle, we have increased our financial guidance for the year. We're off to a strong start in planning for the integration of Pringles, and are encouraged by the prospects for the new combined entity."

**Corporate Highlights**

\*       \*       \*

• On April 5, 2011, Diamond announced the merger of P&G's Pringles business into Diamond in a Reverse Morris Trust transaction with an expected close by the end this calendar year.

• Adjusted EBITDA grew 139 percent to $32.4 million.

• A quarterly dividend of $0.045 per share was paid on May 3, 2011 to shareholders of record as of April 22, 2011.

\*       \*       \*

**Financial Results**

Net sales during the quarter grew 61 percent to $223 million, driven by significant growth in snack revenue and international non-retail sales. Snack revenue growth of 72 percent is attributed to two additional months of Kettle in the results this year and double digit organic growth across the snack portfolio. Non-retail sales for the quarter grew as a result of increased supply that was primarily shipped to international markets. Fiscal year-to-date net sales grew 46 percent to $733.1 million.

For the quarter, gross profit as a percentage of net sales was 26.7 percent compared to the prior year quarter's 22.4 percent, primarily as a result of sales mix and productivity improvements. For the first nine months of the fiscal year, gross profit as a percentage of net sales was 26.5 percent, 320 basis points above the prior year comparable period's 23.3 percent. . . .

Selling, general and administrative expense (SG&A) was $24.2 million during the quarter, and SG&A as a percentage of net sales was 10.8 percent. Fiscal year-to-date SG&A was $71.3 million, or 9.7 percent of net sales.

Advertising expense was $11.9 million during the quarter, up 57% over the prior year comparable period, driven by multi-media support for the successful Breakfast on the go! launch in grocery retailers. Advertising expense for fiscal year-to-date was $34.4 million, 32 percent above the prior year's level of $26 million.

Adjusted EBITDA grew 94 percent to $115.8 million year to date.

As of April 30, 2011, net debt outstanding was $549.4 million and net leverage ratio was 3.9.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS       - 11 -

**Financial Outlook**

For the fourth quarter of fiscal 2011, we expect non-GAAP EPS of between $0.40 to $0.44 and net sales of between $210 million to $220 million.

This fourth quarter guidance implies that for the full fiscal year, we now expect net sales of between $943 million to $953 million compared to $925 million to $950 million previously and non-GAAP EPS of $2.48 to $2.52 compared to $2.45 to $2.51 previously. *This increased EPS guidance represents growth in net income of 52 percent to 55 percent over full fiscal 2010 results. This full year guidance reflects*:

• Snack sales of $545 million to $560 million;

• Gross margin growth of 200 to 300 basis points over 2010;

• Advertising investment of $43 million to $44 million;

• Operating income as a percent of net sales of 11 percent to 12 percent, excluding acquisition and integration costs;

• Adjusted EBITDA of $142 million to $145 million;

• An effective tax rate of 33 percent.

For fiscal 2012, guidance is unchanged since it was first provided on April 5, 2011. For Diamond on a standalone basis, we anticipate non-GAAP EPS of $2.85 to $2.98, an increase of 14 percent to 19 percent over the midpoint of the updated guidance range for 2011. Combined EPS results for Diamond plus Pringles, assuming the transaction closes by the end of this calendar year, are expected to be $3.00 to $3.10 per share, excluding costs associated with the transaction and integration.

(Footnotes omitted.)

29.    On June 21, 2011, the Company announced that the Hart-Scott Rodino Act waiting period had expired, thus removing one hurdle to the execution of the Pringles acquisition:

**Diamond Foods Announces Expiration of Hart-Scott-Rodino Act Waiting Period for Acquisition of Pringles**

. . . Diamond Foods, Inc. today announced that the waiting period for U.S. antitrust review under the Hart-Scott Rodino Antitrust Improvements Act of 1976 for Diamond Foods' pending acquisition of the Pringles business from The Procter & Gamble Company expired on June 20, 2011. The pending acquisition remains subject to regulatory approval by competition authorities in various jurisdictions outside the United States.

On April 5, 2011, Diamond Foods announced the signing of a definitive agreement to acquire the Pringles business from The Procter & Gamble Company in a Reverse Morris Trust transaction valued at $2.35 billion. The transaction, expected to close by the end of this calendar year, is also subject to satisfaction of other conditions including approval by Diamond's stockholders.

1    30.    On September 15, 2011, the Company issued a press release announcing its fourth

2  quarter 2011 and fiscal year 2011 financial results:

3    **Diamond Reports Record 2011 Results and Raises Guidance for Fiscal 2012**

4    •    Snack sales grew 16 percent in the fourth quarter and 72 percent for the fiscal
         year;

5

6    •    Non-GAAP Earnings Per Share (EPS) increased 37 percent for the fiscal
         year;

7    •    Raising sales and EPS guidance for fiscal 2012.

8            . . . Diamond Foods, Inc. today reported record financial results for its fiscal
         2011 fourth quarter and full year.

9

10           For the three months ended July 31, 2011, the first full comparable quarter
         since the acquisition of Kettle Foods, non-GAAP net income grew 58 percent to
         $11.9 million and non-GAAP fully diluted earnings per share (EPS) grew 53 percent

11       over the prior year's quarter to $0.52. During the quarter, the Company incurred $9.4
         million in acquisition and integration costs related to the purchase of Kettle Foods in

12       2010 and the pending acquisition of Pringles. Including these charges, *GAAP net
         income grew 27 percent to $8.5 million and GAAP fully diluted EPS was $0.37, up

13       23 percent*.

14           For the twelve months ended July 31, 2011, non-GAAP net income grew 61
         percent over the prior year period to $59.0 million and non-GAAP EPS grew 37

15       percent to $2.61. Including $16.8 million in acquisition and integration costs related
         to the purchase of Kettle Foods in 2010 and the pending acquisition of Pringles,

16       *GAAP earnings grew 92 percent to $50.2 million, and GAAP EPS grew 63 percent
         to $2.22*.

17

18           "*Our base Diamond business delivered record financial results this quarter,
         with our snack portfolio up a solid 16 percent on an organic basis*," said Michael J.

19       Mendes, Chairman, President and CEO. "We're particularly pleased that we could
         achieve   such   strong   performance   while   effectively   managing   the   Pringles
         integration."

20

21                                    **Corporate Highlights**

                                      *       *       *

22

23   •    Full year adjusted EBITDA grew 72 percent to $146 million.

24   •    . On August 3, 2011, the Company received the last of its antitrust clearances
         required for its pending merger of the Pringles business into Diamond in a
         Reverse Morris Trust transaction. The transaction is expected to close in

25       December of this year.

26   •    . Significant progress on Pringles integration activities including go-to-market
         planning, preparing to onboard employees at close, day one readiness and

27       transition services planning.

28

---

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 13 -

- A quarterly dividend of $0.045 per share was paid on August 8, 2011 to shareholders of record as of August 1, 2011.

**Financial Results**

Net sales during the quarter grew 32 percent to $232.8 million as a result of the strong performance of the snack portfolio and an increase in non-retail sales. Total retail net sales grew 14 percent to $191.0 million, and snack sales grew 16 percent to $145.7 million in the quarter. Non-retail sales totaled $41.8 million for the quarter compared to $41.3 million in the third quarter and $8.7 million in the fourth quarter a year ago. Full fiscal year net sales grew 42 percent to $965.9 million, with retail net sales up 43 percent to $816.1 million. Snack sales grew 72 percent for the full year and reached $553.2 million.

Gross profit as a percentage of net sales was 24.5 percent for the quarter and 26 percent for the year. The lower gross margin in the quarter reflects the relatively large percentage of non-retail sales in the quarter.

Selling, general and administrative expense (SG&A) was $25.7 million during the quarter. For the full fiscal year SG&A was $97.0 million, or 10 percent of net sales.

Advertising expense was $10.1 million during the fourth quarter, up 45 percent over last year's comparable period. For the full fiscal year, advertising expense was $44.4 million or 5.4 percent of retail net sales, an increase of $11.5 million over last year.

The effective tax rate on a non-GAAP basis was 23.6 percent for the quarter and 31.3 percent for the year, reflecting favorable income mix within our tax jurisdictions. On a GAAP basis, the effective tax rate was (38.4) percent for the quarter and 27.4 percent for the year. The tax benefit in the quarter reflects a discrete benefit associated with the 2 percent U.K. rate reduction announced in July.

Capital expenditures for the year were $28 million. The Kettle capacity expansion in Salem was completed in April and the U.K. and Beloit, Wisconsin Kettle expansions are on schedule for completion in the fall of 2011 and spring of 2012, respectively.

As of July 31, 2011, net debt was $512.8 million, a decrease of $37 million from the prior quarter.

**Financial Outlook**

\*      \*      \*

For the full year of fiscal 2012, we expect non-GAAP EPS to range from $3.05 to $3.15, assuming the Pringles transaction closes in the first half of December. This EPS guidance is increased from $3.00 to $3.10 previously and reflects:

- Net sales of between $1.85 billion and $1.95 billion;

- An estimated operating margin of between 11.5 percent and 12.0 percent;

- Interest expense of between $40 million to $45 million;

- An effective tax rate of 27 percent to 30 percent;

- Outstanding share count of 42 million to 43 million;

- Capital expenditures of $75 million to $85 million;

- EBITDA of $300 million to $310 million;

- Transaction and integration costs of $150 million associated with the Pringles transaction over the next two years.

(Footnotes omitted.)

31.     On September 15, 2011, the Company filed its Form 10-K for the period ending July 31, 2011 with the SEC. The Form 10-K substantially repeated the Company's financial results for fiscal year 2011 as reported in the September 15, 2011 press release, and stated that the Company's financial statements were purportedly in compliance with GAAP. The Form 10-K was signed by the Individual Defendants.

32.     On September 27, 2011, *The Wall Street Journal* published an article entitled "Hidden Flaw in P&G's Diamond Deal," which discussed a $50 million payment the Company made in September 2011 to walnut growers, purportedly to "'optimize cash flow for growers . . . in light of the delayed harvest.'" The article suggested that the payment, had it been made during the fiscal year which ended July 31, 2011, would have reduced the Company's fiscal 2011 operating income by $50 million, devouring a substantial portion of the Company's reported fiscal 2011 earnings.

33.     On September 27, 2011, Jefferies published a report entitled "Much Ado about Nothing," which discussed the September *Wall Street Journal* article, stating that the stock price decline in response to the article was an overreaction:

**The Diamond Foods (DMND)**

Much Ado About Nothing

**Yesterday DMND declined 5.7% on reports that profits in 1Q are in jeopardy due to unusual one-time payments to walnut growers the company made in September. We believe that the stock overreacted. It is our understanding that DMND usually makes payments to growers in late August/early September, and even though the size of the payment might have been bigger this year we do not believe that it jeopardizes quarterly results. Regular payments to growers are a result of the walnut purchase agreement.**

1                                    *      *      *

2           DMND's contract with growers basically guarantees the purchase of the
    entire walnut crop of a contracted grower with the price being determined only after
3   DMND has sold the walnuts. As a result, DMND estimates the approx. liability to
    growers and makes periodic payments towards this estimate. The liability to growers
4   peaks in the first half of the fiscal year . . . as the harvest is delivered, and then
    declines as the walnuts are sold and growers are paid. It is our understanding that the
5   September payment of estimated $50 million (source: Wall Street Journal) was such
    a periodic disbursement to growers – even though the reported amount is not
6   anywhere near the actual payment according to mgmt.

7   **As the September payment was not unusual, we believe the stock overreacted**.

8           Instead of potentially wiping out more than half of the reported FY11 EBIT
    the payment appears to be the regular cost of doing business and is part of the
9   expected 1Q12 COGS for DMND.

10          34.     On October 3, 2011, the Company issued a press release entitled "Media Statement –

11  Diamond Foods, Inc. Reaffirms Fiscal 2012 Guidance."  The press release stated as follows:

12  **Media Statement – Diamond Foods, Inc. Reaffirms Fiscal 2012 Guidance**

13          . . . Diamond Foods, Inc. made a pre-harvest momentum payment to walnut
    growers in early September, prior to the delivery of the fall walnut crop to reflect the
14  fiscal 2012 projected market environment. The payment is accounted for in fiscal
    2012 cost of goods sold and is reflected in the guidance provided by the company on
15  September 15, 2011.

16          Diamond reaffirms the guidance provided in its press release dated September
    15, 2011, which reflects not only higher commodity costs expected in fiscal 2012,
17  but also recent retail price increases taken for its products. Diamond believes it has
    an ample walnut supply for both the retail and value-added, non-retail business.

18
                                    **Financial Outlook**
19
            For the first half of fiscal 2012, for Diamond on a standalone basis, we expect
20  total net sales of between $540 million to $560 million, an increase in advertising
    investment of 20-25% over the first half of 2011 and non-GAAP EPS ranging from
21  $1.65 to $1.75. We expect the distribution of earnings between Q1 and Q2 to be
    similar to last year's first half.
22
            For the full year of fiscal 2012, we expect non-GAAP EPS to range from
23  $3.05 to $3.15, assuming the Pringles transaction closes in the first half of December
    and reflects:
24
                    •       Net sales of between $1.85 billion and $1.95 billion;
25
                    •       An estimated operating margin of between 11.5 percent and 12.0
26                          percent;

27                  •       Interest expense of between $40 million to $45 million;

28                  •       An effective tax rate of 27 percent to 30 percent;

1

- Outstanding share count of 42 million to 43 million;

2

- Capital expenditures of $75 million to $85 million;

3

- EBITDA of $300 million to $310 million;

4

- Transaction and integration costs of $150 million associated with the Pringles transaction over the next two years.

5

35.   On October 4, 2011, after meeting with Company management, RBC Capital Markets

6

7
published a report entitled "'He Said, She Said' –Highlights of Marketing with Management,"

8
discussing disclosures concerning "'momentum payments'" to walnut growers and conveying

9
management's "adamant" claim that the momentum payments were not designed to pay the walnut

10
growers for the prior year's crop and that investor concerns were indeed unfounded:

11
**Diamond Foods, Inc. (NASDAQ: DMND)**

12
"He Said, She Said"

13
                              *         *         *

14
Highlights From Marketing With Management

15
                              *         *         *

16
**We marketed with Diamond management yesterday and came away
comfortable that the walnut controversy should subside in due course.**
Unfortunately, this is largely a "he said, she said" debate since management does not

17
provide clear disclosure of its walnut profitability or grower payments. However,
unless management is not being truthful, which we don't think is the case, the bear

18
case should not prevail.

19
**Management gave clear answers to the two most important questions related to
the walnut issue.** First, management is adamant that the company did not structure

20
or communicate the "momentum payment" made last month as a form of
compensation for last year's crop. Second, management commented that

21
substantially all of the gross margin expansion in FY-11 was driven by Kettle and
Emerald, and that margins for the other businesses – walnuts included – were similar

22
to the prior year. If true, this means that walnuts did not massively over-earn in FY-11.

23
36.   On October 27, 2011, the Company announced that Diamond shareholders had

24

25
approved a proposal to issue new Diamond shares in connection with the Company's acquisition of

26
P&G's Pringles business:

27

28

**Diamond Foods Shareholders Approve Issuance of Shares in Connection With Pringles Transaction**

. . . Diamond Foods, Inc. today announced that its shareholders approved a proposal to issue Diamond Foods common shares in connection with the merger of the Pringles business into Diamond. At the special meeting of shareholders held today, Diamond shareholders also approved all other proposals recommended by the Board of Directors.

Closing of the transaction remains subject to customary closing conditions and completion of the exchange offer by The Procter & Gamble Company ("P&G"). Antitrust approvals required for the transaction have already been obtained.

37.     On November 1, 2011, the Company issued a press release stating that the Audit Committee of the Board of Directors would perform an internal investigation into the accounting for the payments to walnut growers and that the highly anticipated merger transaction with Pringles, which had been scheduled to close before the end of the year, would be delayed until mid-2012:

**Diamond Foods Provides Update on Pringles Transaction**

. . . Diamond Foods, Inc. today announced that its previously announced acquisition of the Pringles snack business from The Procter & Gamble Company ("P&G") is now expected to close in the first half of calendar 2012. Diamond and P&G had previously expected the closing to occur in December of 2011.

Diamond and P&G have revised the expected closing date of the acquisition following the receipt by the Chairman of the Audit Committee of Diamond's Board of Directors of an external communication regarding Diamond's accounting for certain crop payments to walnut growers. In response to the communication, Diamond's Audit Committee decided to perform an investigation of this matter. Management is fully committed to supporting the Audit Committee in this process.

Closing of the Pringles transaction remains subject to customary closing conditions and completion of an exchange offer by P&G. Antitrust approvals required for the transaction have already been obtained.

38.     On the November 1, 2011 disclosures, the Company's stock price plummeted 17% to close at $52.79 per share on November 2, 2011, down from $64.12 per share on November 1, 2011, on massive trading volume.

39.     Then, on November 5, 2011, *Barron's Online* published an article entitled "Getting to the Nut of the Problem."  The article discussed in detail the Company's September 2011 "momentum payment" to walnut growers and suggested that the Company may have overstated its fiscal 2011 financial results. In addition, the article stated that Diamond's Head of Field Operations

1  recently admitted that the "momentum payment" was indeed payment for the fiscal 2010 walnut

2  crop as opposed to the fiscal 2011 walnut crop:

3      Getting to the Nut of the Problem

4

5          After nearly a century as a walnut growers' cooperative, Diamond Foods broke out of its shell with a 2005 initial public offering. The San Francisco company, which also sells pine nuts, almonds and pecans, proceeded to gobble up snack brands

6  that included Pop Secret popcorn and Kettle chips – and promoting them with cheeky television ads, among them, an annual 30-second spot on the Super Bowl.

7

8          In April, Diamond took an even bigger bite, announcing plans to acquire the Pringles chips business from [Procter & Gamble] (PG) in exchange for Diamond stock. Those shares had themselves become a premium brand. . . .

9

10          Then, The Wall Street Journal talked to some walnut growers and found serious issues with Diamond's accounting issues that had escaped the eagle-eyed advisors on the Pringles deal: Bank of America Merrill Lynch, Morgan Stanley and the Blackstone Group. On Tuesday, Diamond delayed the Pringles closing while the

11  audit committee of its board of directors investigates how Diamond accounted for its

12  walnut-crop payments. Diamond's shares closed late Friday at $46.40, below their level when the Pringles plan was announced.

13

14          After Diamond's walnut accounting gets scrutiny, the stock could get crushed again.

15  *Suspect accounting for walnut purchases could crack snack-food producer Diamond Foods' deal to buy Pringles from Procter & Gamble.*

16                        \*       \*       \*

17

18          Even after the selloff, Diamond shares look pricey. The acquisitive outfit has no tangible book value. It reported earnings for the fiscal year ended July 2011 of $2.61 a share (ignoring pesky noncash charges, like option expenses), so Diamond's

19  multiple on those trailing earnings is a generous 18 times. And 2011 earnings were likely overstated, says Mark Roberts, whose Off Wall Street Consulting Group rang

20  the first alarm about Diamond's nutty accounting on Sept. 25, when most of Wall Street was still cheering the company on. Had Diamond properly booked costs for

21  fiscal 2011, Roberts estimates, it would've earned as little as $1.14 a share.

22          Diamond declined to talk about the walnut investigation, but a spokesman said that both Diamond and P&G remain committed to completing a Pringles deal

23  next year, which would double the company's sales. Yet if questions arise about Diamond's "representations and warranties" as it offered its shares to P&G

24  shareholders in exchange for the Pringles business, the deal could fall apart or at least become much more expensive for Diamond.

25          Diamond's co-op members got more than half the company's stock in the

26  IPO and signed contracts to sell their entire crop to Diamond for a term of three, five or 10 years. Happily for the farmer shareholders and all others, the stock rose steadily

27  from its IPO price of 17. At the same time, however, many growers became unhappy with their multiyear contracts with Diamond.

28

* * *

Then, in early September, Diamond sent growers something it called "a momentum payment" of 30 to 40 cents a pound. The company said the payment was for the coming 2011 crop, but farmers believe it was really a way to bring Diamond's price for their 2010 crop closer to market rates. Transaction records examined by Off Wall Street's Roberts showed that, until 2009, Diamond had called its August check the "final payment" for the prior year's crop.

* * *

This year, Diamond didn't use the word "final" on its August payment to a grower Roberts spoke with, telling the grower to expect a September "momentum payment." Believing himself underpaid, the farmer asked Diamond's head of field operations if the September payment was for the 2010 crop. According to Roberts, the Diamond executive said yes. Most puzzling, the September payments went to farmers who've ended their sales contracts with Diamond and won't be supplying it with their 2011 year crop. *Barron's* spoke with one of those growers.

Had the September payments been counted as part of Diamond's July 2011 fiscal year, Roberts thinks that the gross margin reported by the company would have shrunk to less than 20%, from about 25%"making the exchange of its shares for Pringles less appetizing for P&G shareholders.

40.     On November 7, 2011, following these detailed disclosures, Diamond's stock price continued to decline on substantial trading volume, falling to a close of $39.09 per share, a 15% decline from its Friday, November 4, 2011, close of $46.40 per share.

## LOSS CAUSATION/ECONOMIC LOSS

41.     During the Class Period, as detailed herein, defendants made false and misleading statements about the strength of the Company's business and prospects and engaged in a scheme to deceive the market.  This artificially inflated Diamond's stock price and operated as a fraud or deceit on the Class.  Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Diamond's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time.  As a result of their purchases of Diamond securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

42.     Diamond's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

1    43.    The defendants are also liable for any false or misleading FLS pleaded because, at the

2 time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

3 authorized and/or approved by an executive officer of Diamond who knew that the FLS was false.

4 None of the historic or present tense statements made by defendants were assumptions underlying or

5 relating to any plan, projection or statement of future economic performance, as they were not stated

6 to be such assumptions underlying or relating to any projection or statement of future economic

7 performance when made, nor were any of the projections or forecasts made by defendants expressly

8 related to or stated to be dependent on those historic or present tense statements when made.

9                           **APPLICABILITY OF PRESUMPTION OF**
                            **RELIANCE: FRAUD ON THE MARKET**

10

11    44.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

market doctrine in that, among other things:

12

13        (a)    Defendants made public misrepresentations or failed to disclose material facts

during the Class Period;

14

15        (b)    The omissions and misrepresentations were material;

16        (c)    The Company's securities traded in an efficient market;

17        (d)    The misrepresentations alleged would tend to induce a reasonable investor to

misjudge the value of the Company's securities; and

18

19        (e)    Plaintiff and other members of the Class purchased Diamond securities

20 between the time defendants misrepresented or failed to disclose material facts and the time the true

facts were disclosed, without knowledge of the misrepresented or omitted facts.

21

22    45.    At all relevant times, the market for Diamond securities was efficient for the

following reasons, among others:

23

24        (a)    As a regulated issuer, Diamond filed periodic public reports with the SEC; and

25        (b)    Diamond regularly communicated with public investors via established

market communication mechanisms, including through regular dissemination of press releases on the

26

27 major news wire services and through other wide-ranging public disclosures, such as

communications with the financial press, securities analysts and other similar reporting services.

28

1

**COUNT I**

2

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

3

46.    Plaintiff incorporates ¶¶1-45 by reference.

4

47.    During the Class Period, defendants disseminated or approved the false statements

5

specified above, which they knew or recklessly disregarded were misleading in that they contained

6

misrepresentations and failed to disclose material facts necessary in order to make the statements

7

made, in light of the circumstances under which they were made, not misleading.

8

48.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

9

(a)    Employed devices, schemes, and artifices to defraud;

10

(b)    Made untrue statements of material facts or omitted to state material facts

11

necessary in order to make the statements made, in light of the circumstances under which they were

12

made, not misleading; or

13

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or

14

deceit upon plaintiff and others similarly situated in connection with their purchases of Diamond

15

publicly traded securities during the Class Period.

16

49.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

17

the market, they paid artificially inflated prices for Diamond securities.  Plaintiff and the Class

18

would not have purchased Diamond securities at the prices they paid, or at all, if they had been

19

aware that the market prices had been artificially and falsely inflated by defendants' misleading

20

statements.

21

50.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and

22

the other members of the Class suffered damages in connection with their purchases of Diamond

23

publicly traded securities during the Class Period.

24

**COUNT II**

25

**For Violation of §20(a) of the Exchange Act
Against All Defendants**

26

27

51.    Plaintiff incorporates ¶¶1-50 by reference.

28

1    52.    The Individual Defendants acted as controlling persons of Diamond within the

2  meaning of §20 of the Exchange Act. By virtue of their positions and their power to control public

3  statements about Diamond, the Individual Defendants had the power and ability to control the

4  actions of Diamond and its employees. Diamond controlled the Individual Defendants and its other

5  officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the

6  Exchange Act.

7                          **CLASS ACTION ALLEGATIONS**

8    53.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

9  of Civil Procedure on behalf of all persons who purchased or otherwise acquired Diamond publicly

10  traded securities during the Class Period (the "Class"). Excluded from the Class are defendants and

11  their families, directors and officers of Diamond and their families and affiliates.

12    54.    The members of the Class are so numerous that joinder of all members is

13  impracticable. The disposition of their claims in a class action will provide substantial benefits to

14  the parties and the Court. Diamond has more than 22 million shares of stock outstanding, owned by

15  thousands of persons.

16    55.    There is a well-defined community of interest in the questions of law and fact

17  involved in this case. Questions of law and fact common to the members of the Class which

18  predominate over questions which may affect individual Class members include:

19            (a)    Whether the Exchange Act was violated by defendants;

20            (b)    Whether defendants omitted and/or misrepresented material facts;

21            (c)    Whether defendants' statements omitted material facts necessary in order to

22  make the statements made, in light of the circumstances under which they were made, not

23  misleading;

24            (d)    Whether defendants knew or recklessly disregarded that their statements were

25  false and misleading;

26            (e)    Whether the prices of Diamond publicly traded securities were artificially

27  inflated; and

28

1    (f)    The extent of damage sustained by Class members and the appropriate

2  measure of damages.

3    56.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

4  sustained damages from defendants' wrongful conduct.

5    57.    Plaintiff will adequately protect the interests of the Class and has retained counsel

6  who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

7  with those of the Class.

8    58.    A class action is superior to other available methods for the fair and efficient

9  adjudication of this controversy.

10  **PRAYER FOR RELIEF**

11  WHEREFORE, plaintiff prays for judgment as follows:

12  A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

13  B.    Awarding plaintiff and the members of the Class damages and interest;

14  C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

15  D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

16  proper.

17  **JURY DEMAND**

18  Plaintiff demands a trial by jury.

19  DATED:  November 10, 2011

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS

_____
SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON

1

655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

2

3

4

LAW OFFICES OF MARC S. HENZEL
MARC S. HENZEL
431 Montgomery Avenue, Suite B
Merion Station, PA 19066
Telephone: 610/660-8000
610/660-8080 (fax)

5

6

7

Attorneys for Plaintiff

8

S:\cptdraft\securities\Cpt Diamond Foods.doc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 25 -

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

Gary Simon ("Plaintiff") declares

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action·

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 10/24/11 | 30 | $68.22 |
| 10/24/11 | 14 | $68.00 |
| 10/24/11 | 12 | $68.10 |
| 10/24/11 | 13 | $68.02 |
| 10/24/11 | 13 | $67.99 |
| 10/24/11 | 12 | $67.98 |
| 10/24/11 | 12 | $68.13 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 11/8/11 | 139 | $39.69 |
| | | |
| | | |

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such

reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of November, 2011.

GARY SIMON

- 2 -